IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

IN RE:  GREGORY ROGER ANDREWS and                 4:09-bk-11116 E
        RONDA MICHELLE ANDREWS, Debtors                CHAPTER 7


RICHARD L. COX, Trustee                                          PLAINTIFF

V.                              AP NO: 4:10-ap-01092

GREGORY ROGER ANDREWS ,
RONDA MICHELLE ANDREWS,
BRIAN KEITH ANDREWS,
JEFF ANDREWS,
HARLAND MELTON, and
JAKE ALRED                                                      DEFENDANTS


## MEMORANDUM OPINION

On September 27, 2011, the Court held a trial on the Amended Complaint filed by the

Chapter 7 Trustee, Richard Cox (the **"Trustee"**), against the Debtors, Greg and Ronda

Andrews, two brothers of Debtor Greg Andrews, Brian and Jeff Andrews, and other

defendants.  The Trustee originally sought avoidance of the transfer of the drag racing car

called the "Big Nasty" (the **"Race Car"**) and turnover of the Race Car if it was in the same

condition as when it was transferred.  Since it has been established that the Race Car was

taken apart, painted and transferred, the Trustee now seeks a joint and several judgment

against Defendants Greg and Brian Andrews in the amount of $30,000 together with an

award for the Trustee's attorneys fees and costs, and damages for willful violation of the

automatic stay.

At the September 27, 2011 Trial, Thomas Streetman appeared on behalf of the Trustee; Jeremy Bueker appeared on behalf of the Debtors; Thomas E. Fowler, Jr., appeared on behalf of Brian Andrews and Jeff Andrews; and Jimmy D. Eaton appeared on behalf of Harland Melton. Defendant Jake Alred is in default and made no appearance. At the close of trial, the parties elected to file closing briefs in lieu of closing arguments. At that time, the Court granted a pending Motion for Judgment on Partial Findings (referred to in Court as a "directed verdict")[1] in favor of Defendant Harland Melton. The Court still has under advisement similar motions with respect to Jeff and Brian Andrews. The parties filed their respective briefs on October 27, 2011, with the Trustee filing a very short reply brief on October 28, 2011. The September 27, 2011 Trial is hereinafter referred to as the **"2011 Trial"** to distinguish it from the October 27, 2009 trial (**"2009 Trial"**) held in a related matter concerning the same Race Car.

This matter is a core proceeding, as defined by 28 U.S.C. § 157(b)(2), over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b).

---

[1] *See* Fed. R. Bankr. P. 7052 incorporating Fed. R. Civ. P. 52(c) which provides in part:

(c) JUDGMENT ON PARTIAL FINDINGS. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. . . .

2

## BACKGROUND AND
## PREVIOUSLY FOUND FACTS

The Debtors filed their voluntary bankruptcy petition (the **"Petition"**) on February 19, 2009. On May 15, 2009, Debtors amended the Petition (the **"First Amended Petition"**) to disclose a tax refund, for which they claimed an exemption. On June 19, 2009, Randy and Renee Watson (the **"Creditors"**) filed a complaint (4:09-ap-1150) objecting to the Debtors' discharge in they alleged that the Debtors knowingly and fraudulently made false oaths in filing the Petition, and that they transferred and concealed their property within one year of the Petition. The Debtors' Answer denied every material allegation in the Complaint. The Debtors filed another amended petition on October 23, 2009 (the **"Second Amended Petition"**), in which they disclosed information about transfers and property as alleged in the Complaint. The Court held the 2009 Trial on October 27, 2009. On February 2, 2010, the Court held a telephonic hearing, delivering a lengthy oral opinion (the **"Oral Opinion"**) denying the Debtors' discharge, in part, because the Debtors failed to disclose Greg's interest in the Race Car. In the Oral Opinion, the Court made a number of factual findings that were the basis of the ruling. In response to the *Defendants' Motion to Amend Judgment or For a New Trial* (the **"Motion to Amend"**) in which the Debtors asserted that the Court made several findings of fact in its Oral Opinion that were not supported by the evidence at the 2009 Trial, the Court thoroughly reviewed the testimony and other evidence in the case again, and concluded that it was necessary to correct or amend some of the factual findings made in the Oral Opinion and entered an order correcting those facts on May 6, 2010 (docket

3

#25, 4:09-ap-1150).  The same day, the Court entered a Memorandum Opinion Denying Debtors' Discharge (the **"Memorandum Opinion"**) (docket #26, 4:09-ap-1150) and an Amended Final Judgment (docket #27, 4:09-ap-1150).  In the Memorandum Opinion, the Court made amended and corrected factual findings.  Those that relate to the Race Car and this proceeding are restated below:[2]

1.      The Debtors have been married [since 1996].  Greg Andrews has raced cars since before that time.  Drag racing has long been Greg's great passion in life.

2.      Some time in the early 1990s, Greg and his brother, Brian Andrews, built a drag racing car, called the "Big Nasty" (the **"Race Car"**), from a chassis.

3.      Greg is undisputedly the driver of the Race Car.  He has raced it at public events, appeared in television interviews with it, represented it belonged to him, worked on it, maintained it, named it, stored it, painted extensive detailed designs on it, and held himself

---

[2] Although the Debtor did not appeal the Court's Memorandum Opinion which made numerous specific findings of fact to support the conclusion that the Debtor, Greg Andrews, held an ownership interest in the Race Car, Brian, Jeff, and Greg's attorneys presented evidence during the 2011 Trial as if nothing had previously been decided in this Debtor's case.  In contrast, the trustee's counsel did not prepare to "reprove" the precise findings of facts that the court had already made and relied upon in concluding that Greg held an ownership interest in the Race Car (as restated here).  As a consequence of the differing approaches, during the 2011 Trial, the Trustee presented evidence to supplement the findings made at the conclusion of the 2009 trial, while the Defendants' attorneys treated the prior findings as if their clients had not previously testified under oath about this Race Car even though the relevant important facts which were the subject of their testimony had all occurred prior to the 2009 Trial, and were therefore not subject to change through the passage of time.  The Court recognizes that Brian and Jeff were not parties to the original action, but the Court will not ignore its prior findings or the testimony it previously heard.  The prior testimony and findings are particularly relevant to this case in that the parties conveyed one story about who owned the Race Car in the 2009 Trial and orchestrated a different story for purposes of the 2011 Trial.  Inconsistencies between a witness's testimony in each trial is relevant for purposes of establishing that witness' credibility.

out as its owner to both the Creditors and the general public.[3]

4.     At races, Greg sold T-shirts. One of these T-shirts was introduced into evidence as Plaintiffs' Exhibit #8.  The words "Greg Andrews" appear on the T-shirt, above the picture of the Race Car.  Underneath the picture, the T-shirt reads "Outlaw Door Slammer." Testimony indicated Greg is a member of a drag-racing club called the "Dixie Door Slammers."  The T-shirt makes no reference to any other person or business.  The back of the T-shirt reads:

> Greg Andrews
> Big Nasty
> First in the Fours
> Wynne, AR

5.     Photographs of the Race Car were introduced into evidence. Defendants' Exhibit #2 and Plaintiffs' Exhibit #9 are both photographs of the Race Car that show the passenger side window.  In these photographs, it is apparent that the Race Car has the words "Greg Andrews" on the passenger side window.  Defendants' Exhibit #1 is an older photograph of the Race Car, taken before it was detailed and painted yellow; it shows the driver side window. At that unknown prior date, the Race Car had the words "Andrews Brothers" in the driver side window.  There is no evidence before the Court as to whether the driver side window still has those words.

6.     The uncontroverted testimony was that the Race Car cannot be legally driven

---

[3] Greg testified that he did not discuss the ownership of the car in the television interviews, but acknowledged that people generally have a tendency to assume he is the owner.

on public roads, and therefore, no title to it exists.  Additionally, the evidence was that the Race Car was never listed on any personal property assessment.

7.     Greg worked at the Andrews Auto Body (the **"Body Shop"**), located in Wynne, Arkansas, and owned by Greg's brother, Brian Andrews, for many years before leaving in 2007.  Steve Wallin, whom the Court found to be particularly credible, testified that Greg left the Body Shop as a result of a falling out with Brian.  Tony Sides corroborated Mr. Wallin's testimony about the falling out and stated that the disagreement resulted in a physical altercation between the two brothers.[4]  Mr. Wallin further testified that after the falling out, Greg took possession of the Race Car and it was Mr. Wallin's impression that the Race Car belonged to Greg after that.  The other witnesses' testimony did not contradict Mr. Wallin's testimony, except as to the ownership of the Race Car following the Andrews brothers' falling out.  While the other witnesses generally corroborated Mr. Wallin's testimony regarding possession of the Race Car after the falling out, they contradicted his testimony regarding ownership of the Race Car.

8.     After leaving the Body Shop at some unknown date in 2007, Greg and Randy Watson formed A&W Extreme Painting, LLC (the **"LLC"**).

9.     Mr. Watson testified that Greg said he owned the Race Car.

_____

[4] Upon a review of the transcript of the 2009 Trial, the Court notes that it was Randy Watson who testified regarding the altercation and that it was physical in nature.  (Transcript of the 2009 Trial at 167.) Sides did not testify regarding the altercation.  Regardless, the Court's determination that Greg had an ownership interest in the Race Car was based on his maintaining possession of it after the altercation with Brian.  Whether the altercation was physical or not had no bearing on the Court's decision.

10.     Greg and Mr. Watson both testified that Greg received money from Mr. Watson and that the money was used, as intended by both, for various expenses related to the Race Car.  There was contradictory testimony as to whether Mr. Watson transferred the money to Greg as a gift or a loan.

11.     Mr. Watson had a bus that was painted to match the Race Car.  (Defendants' Exhibit #3.)

12.     Both Greg and Mr. Watson testified that the LLC was dissolved in 2008 after Greg and Mr. Watson had financial disagreements.

. . .

15.     Ronda, Brian, and Greg testified that Brian had been the exclusive owner of the Race Car until recently, when another Andrews brother, Jeff, also acquired an interest in it.  Brian further testified that Jeff acquired a 25% interest in the Race Car.

16.     The Debtors lived in Wynne until around the time they filed the Petition. While the precise location of each Debtor's residence in early 2009 is unclear, Ronda testified that on February 12, 2009, Greg lived with Jeff in Searcy, Arkansas, and she lived with her mother.  She also testified that on February 19, 2009, both Debtors resided at a rented house in Searcy, Arkansas. This house appears in photographs submitted into evidence as Plaintiffs' Exhibits #6 & #7.  Debtors still resided at this address on the date of the [2009] Trial.

. . .

22.     The Race Car was listed for sale shortly before [the 2009] Trial.  Tony Sides

7

testified that Jeff instructed him to list the Race Car for sale. The list price was $33,000. The Debtors did not seek permission from the Court to sell the Race Car. Prior to the [2009] Trial, the Debtors did not disclose the Race Car's existence.

23.     On the day of the [2009] Trial, the Race Car and a trailer alleged to be owned by Brian Andrews were both stored at the Debtors' home in Searcy. Plaintiffs' Exhibit #7 is a photograph, taken on an unknown date, showing the utility trailer stored in the Debtors' attached garage. Neither the Race Car nor the trailer was listed on Debtors' schedules and statement of financial affairs in any of their bankruptcy petitions.

24.     In the Second Amended Petition, filed on the eve of the [2009] Trial and on the same day that the Creditors served subpoenas on the witnesses to be called at [the 2009] Trial, the Debtors added those possessions and transfers that were alleged in the Complaint,[5] except that they did not add the Race Car (Complaint ¶8) or the utility trailer (Complaint ¶4). Debtors allege that they do not own either of these items, each testifying that the Race Car belongs to Brian and Jeff, their utility trailer was destroyed by a tornado, and the utility trailer currently in their possession belongs to Brian.

25.     The Court did not find Greg or Brian's testimony credible. The Court finds that Greg held an ownership interest in the Race Car.

        . . .

_____

        [5] The Debtors did not add possessions and transfers exactly as alleged in the Complaint. For example, the Complaint alleges that the Debtors possess a number of items, such as the Motorcycle, that are listed in the Second Amended Petition as past transfers rather than current possessions. However, the Second Amended Petition does respond to the allegations pertinent to each material possession and transfer except the Race Car and the utility trailer.

## FINDINGS OF FACT

Greg Andrews, Brian Andrews, Randy Watson, Jeff Andrews,[6] Tony Sides, Bruce Mize, and Harland Melton testified at the 2011 Trial. Just as in the 2009 Trial, the Court did not find Greg or Brian credible. Both were evasive and repeatedly claimed they were bad with dates. For instance, Greg could not pin down when he lived where, could not recall when he painted the Race Car blue (which occurred between the October 27, 2009 trial and February 17, 2010, the date it was sold to Harlan Melton), and was not very specific about who he drove for and whether or not his name was on the race cars he drove for others. More importantly, both testified inconsistently with prior testimony and each other, as described in more detail below. The Court also did not find Jeff, Tony Sides, or Bruce Mize particularly credible; they all appeared to be collaborating on the same story to protect the interests of Greg and Brian (a story that changed between the 2009 and 2011 Trials). The Court did find the testimony of Randy Watson and Harland Melton credible. Given the lack of credibility of all but two of the witnesses, the bulk of the testimony cannot be credited. However, based on documentary evidence and the testimony which the Court did find credible, the Court makes the following findings of fact:

1.     The Race Car chassis was originally a 1982 Camaro which did not have a Vehicle Identification Number, an engine, a transmission, or a fire wall, and only contained the "housing" for the rear-end of the vehicle. Defendant's Exhibit BA-1, BA-2 and BA-3

---

[6] The Andrews brothers will be referred to by their first names for the remainder of this Memorandum Opinion.

were photographs of the 1982 Camaro chassis when it was first purchased; in BA-3, Brian's brothers, Jeff, Marcus and Greg, are pictured along with Brian's son, Devon. Brian testified he paid $2,500 cash for the chassis. Defendant's Exhibit BA-4 is a photograph of the 1982 Camaro chassis with a 454 Chevy Big Block engine installed just before bodywork began on the chassis, according to Brian's testimony. Brian testified the 454 Chevy Big Block engine came out of his yellow Chevrolet truck which he owned since high school; a photograph of the truck and engine was accepted as Defendant's Exhibit BA-5. (Transcript of 2011 Trial at 95.)

2.     At some later date, the 1982 Camaro chassis was altered to look like a 1992 model Camaro by changing the front end (although it still had the steel frame body from the 1982 chassis). Greg painted this version of the Race Car black with green flames, and it had the 454 Chevy Big Block engine in it. (Transcript of 2011 Trial at 101-102.) At that time, the Race Car had the name "Andrews" painted on the window. Defendant's Exhibit BA-13 is a 2004 photograph of the 1992 version of the Race Car. Brian testified that he drove the 1992 version of the Race Car a couple of times but did not like it; instead, Greg drove it. (Transcript of 2011 Trial at 102.)

3.     At some point after the 2004 photo was taken, the Race Car's metal body was replaced with a 2002 Camaro fiberglass body to reduce its weight and make the Race Car faster. The Race Car contained the same chassis, engine, and wheels. The window markings were changed to "Greg Andrews" because he was the driver, according to Brian's testimony. (Transcript of 2011 Trial at 105.) Defendant's Exhibit BA-14 is a photograph of the 2002

10

style Race Car painted bright yellow with intricate race checkered flag designs and the name "Big Nasty" on it.  It was a beautifully painted car.

4.      In the 2011 Trial, Brian testified that Jeff loaned him $2,500 to purchase the fiberglass body, although Brian could not remember what year or month this occurred. (Transcript of 2011 Trial at 106.)  Jeff testified that he gave the money to Brian in or around April, 2005.  (Transcript of 2011 Trial at 176.)  Brian testified he paid Jeff back the $2,500 after he sold the Race Car to Harlan Melton on February 19, 2010 (Transcript of 2011 Trial at 113-114), and Jeff testified he received the $2,500 (Transcript of 2011 Trial at 177).  This testimony contradicts the testimony given by both Brian and Ronda in the 2009 Trial during which both Brian and Ronda testified that Jeff and Brian owned the car.  (Transcript of 2009 Trial at 91, 191.)  Specifically, when asked who owned the car in 2009, Brian responded: "I do.  Me and my brother, Jeff, but I own 75% of it."  (Transcript of 2009 Trial at 191.)  Brian testified that Jeff gave him $5,000 for his part in the car to obtain his interest.  (Transcript of 2009 Trial at 192-93.)  He also testified that if the car ever sold, his agreement with Jeff was that he would receive 75% of the sale proceeds and Jeff would receive 25% of the proceeds.  (Transcript of 2009 Trial at 195.)  This is in obvious contrast to both Brian and Jeff's testimony in 2011 in which Jeff supposedly loaned Brian $2,500 for the 2002 fiberglass body and received just $2,500 (far less than 25% of the sale proceeds) when the Race Car was sold.

5.      During the 2011 Trial, Brian testified that with the exception of the $2,500 he borrowed from Jeff to purchase the 2002 fiberglass body, Jeff and Greg did not purchase any

11

parts to build the Race Car. (Transcript of 2011 Trial at 95.) Receipts for some parts totaling $1,516.30 showing delivery to Brian were accepted into evidence as Defendant's Exhibits BA-6 through BA-12. There was no indication on the face of the receipts that the parts were purchased specifically for the Race Car. Tony Sides, who owns a shop next door to Brian's business, testified those parts would not have been appropriate for other vehicles Brian owned or worked on in his shop. (Transcript of 2011 Trial at 183-184.) Brian acknowledged owning between 40 and 50 race cars but stated that none were the same caliber as the Race Car (Transcript of 2011 Trial at 117), and Sides testified that the tires purchased for the Race Car would not fit under the other cars (Transcript of 2011 Trial at 184). Although these receipts show that specific parts were ordered by and delivered to Brian and that those parts were most likely put into the Race Car, the Court does not find these receipts or Sides's testimony to be conclusive evidence that Brian paid for these parts or that the Race Car solely belonged to him. For example, Greg could have reimbursed him for the parts.

6.      Greg, Brian, Jeff, Bruce Mize and Sides all reiterated that Greg was the driver of the Race Car. Greg testified that he had driven it since 1998 or 1999 until it was sold in 2010. (Transcript of 2011 Trial at 33.) Mize testified that Greg drove the Race Car and was the "face of the car" as far as the public was concerned. (Transcript of 2011 Trial at 192.) Greg testified he drove the Race Car because it was a speciality race car that required a special license, and he held the special license required. (Transcript of 2011 Trial at 45.) A copy of that license was accepted as Defendant's Exhibit BA-20. Greg testified he also drove for several other people including Sides, Lennie Couch, Mickey Epps and some others

12

whom he could not recall.  (Transcript of 2011 Trial at 46.)  He said he painted all those cars and his name was on some of them although he did not name any specific ones.  (Transcript of 2011 Trial at 47.)  Mize testified that he owns race cars and sometimes has others drive them including Greg, but for the most part, he liked to drive his own race cars and put his name on them.  (Transcript of 2011 Trial at 191.)

7.      Greg testified that some time in 2007 or 2008, he and his brother Brian had a "cuss fight" which was really just an argument or "getting our tempers up."  (Transcript of 2011 Trial at 37, 64.)  He testified that they went to a race together just a few weeks later. He again acknowledged that he had possession of the Race Car both before and after the argument with Brian.  (Transcript of 2011 Trial at 39.)  Watson recalled the altercation between Greg and Brian occurring early in 2007 after a Memphis Motor Sports event called the "super chevy."  (Transcript of 2011 Trial at 125.)  Greg told Watson that he and Brian had gotten into a heated argument, and that Brian grabbed Greg by the throat and then they parted.  (Transcript of 2011 Trial at 125.)  Watson also recalled that Brian attended races with Greg after this altercation.  (Transcript of 2011 Trial at 139-140.)  Whether the altercation was a mere "cuss fight" or a physical altercation, there is no conflict as to two facts: (1) Brian and Greg had an argument, and (2) Greg left the shop and no longer worked there but retained possession of the Race Car immediately after the argument.

8.      As the Court previously found, Greg stopped working for Brian after their falling out, and Greg became business partners with Randy Watson.  Together, they operated an LLC called A&W Extreme Paintworks located in Wynne.  Watson testified that he and

13

his wife owned the shop where the business was located, and Greg worked there, painting cars and overseeing the activities at the shop. (Transcript of 2011 Trial at 133-34.) Greg testified that Watson was also involved in the racing of the Race Car as a sponsor and as a friend. Greg testified that Watson provided money for parts for the car, and that Watson owned an RV that pulled the Race Car to racing events. Greg also testified that he painted the RV to match the Race Car in early 2008 but did not own an interest in the RV. (Transcript of 2011 Trial at 58-59.)

9.    Watson testified that he was only associated with Greg, not Brian, in racing the Race Car. He paid for parts, paid for Greg to go to some races, and attended some races with Greg. Watson testified that Greg and Ronda always referred to the Race Car as their car. (Transcript of 2011 Trial at 161-163.) He also testified that he had heard Brian refer to the car as Greg's. Watson's testimony that he paid for parts for the Race Car is consistent with Greg's testimony during the 2011 Trial (Transcript of 2011 Trial at 58-59); the Court finds that Brian did not purchase all the parts for the Race Car as he testified.

10.    Brian claimed that he had a conversation with Watson at his shop regarding Watson's sponsorship of the Race Car, and that he allowed the sponsorship but informed Watson that he owned the car. (Transcript of 2011 Trial at 194; Transcript of 2009 Trial at 194.) In 2009, Watson testified that once Brian and Greg had their fight and split up, he had no conversations with Brian and either he or Greg had possession of the Race Car and it was

14

his understanding that Brian no longer had an interest in the Race Car.[7]  (Transcript of 2009 Trial at 182-83.)  In 2011, Watson testified he never had a specific conversation with Brian about ownership of the Race Car.  (Transcript of 2011 Trial at 140, 162.)  On redirect in 2011, Brian became angry and said that he told Watson he owned 110% of the car.  (Transcript of 2011 Trial at 194.)  The Court does not believe Brian's testimony regarding this conversation.

11.    Jeff claimed with certainty that Greg never owned the Race Car.  (Transcript of 2011 Trial at 176.)  Sides and Mize each said that they had no knowledge of Greg ever having any ownership interest in the Race Car.  (Transcript of 2011 Trial at 182-83, 188).  Mize testified that he often teased Brian about the car belonging to Greg, and that Brian became very upset about that.  Mize said that he had worked on the car some and stored it at his house; he testified Brian paid him for the work done to the car.  (Transcript of 2011 Trial at 188-89).

12.    On June 17, 2008, Greg applied for a loan with the First National Bank of

---

[7] Specifically, when asked whether such a conversation took place, Watson testified: No.  He ain't -- he ain't -- I mean, we've had no conversation since -- since Greg left and, I mean, like I said, it stayed -- it stayed on my property probably for the biggest part of '08.  I know at least several months.  And what time it wasn't there, it stayed under his carport.  I mean, there -- and we went to the races.  I mean, yes, out of pocket, me and my wife and our family, yes, we used an RV; yes, we do carry it to the track -- we spent a lot of money carrying it back and forth to the track and had a great time doing it, but he was always, always -- and he was adamant about this -- that it was his car.  I mean, there -- there was never, after the point that he -- him and Brian broke up, the car was always in his possession and he was adamant to me, my family, my friends, this was his car.

Wynne in order to buy a motorcycle. A copy of the credit application was introduced as Defendant's Exhibit BA-23. Under the description of assets section, there is a box labeled "Automobile." In that box, a 2000 Pontiac Grand Prix and a 2000 GMC Truck are listed. Immediately above the automobile box, is a box labeled "Life Insurance." In this box, a 2002 Camaro race car is listed with a value of $30,000. Greg testified that Matt Boone, the loan officer, filled out the application after asking Greg for the information, and when he asked if he had life insurance, he answered yes. Greg testified that Boone then asked him why he had life insurance and he explained it was because he drove a fast 2002 Camaro race car, and his wife made him get it. Greg said he believed Boone then listed the Camaro instead of the life insurance policy by mistake. Greg further explained that he had obtained a $25,000 life insurance policy in 1999 at his wife's insistence because the Race Car was so fast. (Defendant's Exhibit BA-24 is a printout for the life insurance policy showing it was current through May 2011.) Greg also testified that he may have made a mistake and told Boone the insurance policy was for a $30,000 benefit instead of $25,000. (Greg's testimony regarding the listing of the car on the loan application is found at Transcript of 2011 Trial at 54-57.) Greg's explanation for why the Race Car is listed in the insurance box is implausible. The plausible explanation is that there was not enough room to put it in the automobile box with the other vehicles so it was written directly above those in the life insurance box. The Court does not find Greg's explanation credible, and finds that Greg listed the Race Car on the credit application as one of his assets.

       13.    The Race Car was listed for sale on www.RacingJunk.com on August 26, 2009,

by Tony Sides.  The car was listed as an '02 Camaro and included a picture of it painted yellow with the "Big Nasty" name on it at, and the asking price was $35,000.  Tony Sides's phone number was listed as the seller phone number.  At the 2009 Trial, Tony Sides testified that Jeff instructed him to list the Race Car for sale.  (Transcript of 2009 Trial at 39.)  Brian also testified in 2009 that he told Jeff to have Sides list the car.  (Transcript of 2009 Trial at 195.)  In the 2011 trial, Sides testified that Brian instructed him to list the Race Car for sale. (Transcript of 2011 Trial at 180.)  Brian testified that he asked Sides to place the internet ad, and that he had sold three or four cars for him before.  Brian explained that he was computer illiterate and would pay Sides $100-200 if the listing resulted in a sale.  (Transcript of 2011 Trial at 86.)

14.     Greg testified that the Race Car was stored wherever it was convenient, including:  his house, Brian's shop, the shop at Brian's house, Mize's house, and at the home of another man who worked on the chassis at one point.  (Transcript of 2011 Trial at 37.) Watson testified that the morning of the 2009 Trial, he saw the tongue of the trailer that held the Race Car sticking out from under Greg's garage at his home in Searcy; he assumed the Race Car was there at that time.  (Transcript of 2011 Trial at 127.)  During the 2009 Trial, a picture showing the tongue of the trailer sticking out from under Greg's garage door was admitted into evidence.  (Transcript of 2009 Trial at 86.)  Watson also testified he had seen the Race Car at Greg's house at least two and possibly three other times prior to the 2009 Trial.  (Transcript of 2011 Trial at 128.)  At the 2009 Trial, Greg testified that the Race Car was at his home that day (Transcript of 2009 Trial at 141); the Court specifically found in

17

its prior findings of fact that it was at Greg's home that day. (Memorandum Opinion, Finding of Fact No. 23.) At the 2011 Trial, Greg specifically testified that the Race Car was not at his home that day.[8] (Transcript of 2011 Trial at 212.)

15.     Although Jeff and Brian were not parties to *Watson v. Andrews*, Brian testified at the 2009 Trial, and Jeff was present according to Greg. (Transcript of 2011 Trial at 39.) Both knew that ownership of the Race Car was an important issue at the 2009 Trial.

16.     Greg testified that he and Ronda were at his lawyer's office when the Court gave its oral ruling on February 2, 2010. He testified that he called his brothers afterwards and told them about the ruling. (Transcript of 2011 Trial at 40.)

17.     On February 19, 2010, just 17 days after Court entered its oral ruling, Brian sold the Race Car to Harlan Melton. Brian testified he was unaware of this Court's ruling regarding Greg having an interest in the Race Car. He acknowledged that there was "some confusion" about who owned the Race Car. (Transcript of 2011 Trial at 78-79.) When asked why he did not file a motion with the Court requesting authority to sell the Race Car, Brian testified that he did not think he had to because he owned it and should be able to do what

---

[8] During the 2011 Trial, Debtors' counsel attempted to discredit Watson's testimony by questioning him about the time of day he saw the trailer sticking out of Greg's garage. Watson thought it must have been very early in the morning in order to allow him time to get to Little Rock for court. Mr. Bueker questioned Watson whether he drove by Greg's house before sunrise, implying that he could not have adequately seen the trailer sticking out of Greg's garage. The Court takes judicial notice of its docket, and notes that the 2009 Trial was scheduled for 10 a.m.; the Court also takes judicial notice that Searcy is at most an hour and a half drive from Little Rock, and accordingly, Watson would not have necessarily been driving by Greg's house in Searcy before sunrise that morning. Further, Watson's memory about the car being there on that day is irrelevant given that Greg admitted that it was there during the 2009 Trial.

he wanted to with it.  (Transcript of 2011 Trial at 79.)  He stated that about five to ten minutes after the 2009 Trial, he talked to Greg's lawyer, Jeremy Bueker, and asked him, "what about my car?" and Bueker replied, "it's your car – do what you want with it."[9] (Transcript of 2011 Trial at 80.)  Brian testified that Greg, Ronda and several others were standing around when this conversation took place.  (Transcript of 2011 Trial at 84.)  The Court finds that Brian knew, as a result of his involvement as a witness at the 2009 Trial and as a result of his close relationship with Greg (and Greg's admission that he told Brian about the ruling the same day it was made), that ownership of the Race Car was an issue before this Court but nevertheless reduced its value by repainting it and taking it apart, and then arranged the sale of the Race Car to Melton.

18.    Brian sold the Race Car to Melton without an engine or transmission for $16,000.  He accepted $2,000 in cash and a Nova worth $14,000 as a trade-in.  Copies of the Bill of Sale were accepted into evidence as Plaintiff's Exhibit 2 and Defendant's Exhibit BA-22.  Brian testified that they negotiated the sale of the Race Car for approximately six to eight weeks before they closed the sale.  This amount of time was necessary to allow Melton to get the money and for Brian to take out the engine and transmission and paint the car blue. (Transcript of 2011 Trial at 87.)  Greg testified that he painted the car blue for Brian but could not remember when, but that it was cold.  (Transcript of 2011 Trial at 42.)  Brian

---

[9] This testimony, if true, raises professional issues for Mr. Bueker.  However, Mr. Bueker refrained from questioning Brian about it during trial.  The Court assumes Mr. Bueker showed this restraint out of consideration for the interests of his client Greg.

testified that he wanted it painted blue because the car had become a sore in his side and he did not want anyone to know that it was his car. (Transcript of 2011 Trial at 87.) No photograph of the Race Car after it was taken apart and repainted was introduced into evidence.

19.    Melton testified that he was not aware of any dispute over ownership of the Race Car and believed Brian to be the owner. (Transcript of 2011 Trial at 209.) He knew that Greg was the driver. He was familiar with the Race Car and the Andrews brothers, but was not close friends with them. (Transcript of 2011 Trial at 208.) The Court finds that Melton was unaware of the pending bankruptcy or that ownership of the Race Car was an issue before this Court. Melton paid what he thought was a fair price for the shell of the car he was buying.

## ANALYSIS

The Trustee filed this lawsuit to avoid the transfer of the Race Car and recover damages for the benefit of the Debtors' bankruptcy estate. Because it has been established that the Race Car was taken apart, painted, and transferred just 17 days after this Court found that Greg held an interest in the Race Car on the day he filed bankruptcy, the Trustee now seeks a joint and several judgment against Greg and Brian Andrews in the amount of $30,000 together with an award for the Trustee's attorneys fees and costs as damages for willful violation of the automatic stay. Accordingly, the Court must determine whether the transfer of the Race Car is avoidable under 11 U.S.C. § 549, and if so, whether damages for willful violation of the automatic stay are appropriate.

## **Avoidable Transfer Under 11 U.S.C. § 549**

"A transfer . . . may be avoided under 11 U.S.C. § 549(a) if:  (1) the subject property was property of the bankruptcy estate; (2) the property was transferred; (3) the transfer was made post-petition; and (4) the transfer was not authorized by the bankruptcy code or the bankruptcy court."  *In re Hecker,* 2011 WL 4975813, 3 (B.A.P. 8th Cir. 2011) (citing *Nelson v. Kingsley (In re Kingsley),* 208 B.R. 918, 920 (B.A.P. 8th Cir. 1997); *Schnittjer v. Burke Construction Co. (In re Drahn),* 405 B.R. 470, 473 (Bankr. N.D. Iowa 2009)).  The party seeking to validate the transfer has the burden of proof.  Fed. R. Bankr. P. 6001.  *See generally In re Beshears*, 196 B.R. 464 (Bankr. E.D. Ark. 1996).  A debtor's bankruptcy estate consists of all legal and equitable interests of the debtor existing at the commencement of the bankruptcy case. 11 U.S.C. § 541(a).  The debtor's interest in property is determined under state law.  *See In re Stanley*, 182 B.R. 241, 243 (Bankr. W.D. Ark. 1994).

In this case, there is no question that the Race Car was repainted, taken apart, and the bulk of it transferred post-petition without the Trustee's knowledge and without Court approval or authorization under the Bankruptcy Code.  Further, as previously noted, this Court already found that Greg's bankruptcy estate held an interest in the Race Car at the conclusion of the 2009 Trial, based on the evidence received during that Trial.  Now the Court must decide what the Debtors' interest was in the car in order to determine liability under § 549 for transfer of the Race Car.  Brian and Jeff were named defendants in this case and had the opportunity to prove exactly what their ownership interest was.  Although the Court cannot find Jeff's testimony completely credible, as already explained, no evidence

21

was presented to show that Jeff held an ownership interest in the car or that he participated in its destruction and transfer other than his testimony that he recouped his $2,500 investment (if that is even true). Accordingly, the Court grants the Motion for Judgment on Partial Findings with respect to Jeff Andrews. However, as explained below, the evidence presented is not sufficient to find that Brian Andrews owned the Race Car (particularly given that Brian Andrews' testimony could not be credited).

In Arkansas, "[i]t is well settled . . . that possession of personal property is *prima facie* evidence of ownership." *Velder v. Crown Exploration Co.*, 10 Ark. App. 273, 274-275, 663 S.W.2d 205, 207 (1984) (citing *Golenternek v. Kurth*, 213 Ark. 643, 212 S.W.2d 14 (1948); *Norton v. McNutt*, 55 Ark. 59, 17 S.W. 362 (1891)). "*Prima facie* evidence is deemed sufficient to establish a given fact if not contradicted, rebutted or explained by other evidence." *Id.* Further, "'[w]hen a fact is peculiarly within the knowledge of a party, the burden is on him to prove such fact . . . .'" *Texas Company v. Mattocks,* 211 Ark. 972, 979, 204 S.W.2d 176, 180 (1947).[10] Greg acknowledged that as the driver of the Race Car since 1998 or 1999, he often had possession of it; in the 2009 Trial he testified that it was mostly

---

[10] The Court in *Texas Company* stated:

> No one but the producer could [have] possibly known the amount of oil production. The principle applicable here was thus stated by Mr. Wharton (Evidence, sec. 367): 'When a fact is peculiarly within the knowledge of a party, the burden is on him to prove such fact, whether the proposition be affirmative or negative.' *Hopper v. State*, 19 Ark. 143; *Williams v. State*, 35 Ark. 430; *Flower v. State of Arkansas*, 39 Ark. 209; *City of Fort Smith v. Dodson*, 51 Ark. 447, 11 S.W. 687, 4 L.R.A. 252, 14 Am.St.Rep. 62.

211 Ark. at 979, 204 S.W. 2d at 180.

kept at his house.  He had possession of it both before and after the altercation with Brian, and as previously found by this Court, he had possession of it the day of the 2009 Trial. Greg's possession of the Race Car establishes a *prima facie* case that he owned the Race Car, and it was up to the Defendants to prove otherwise.

Although the racing of the "Big Nasty" seems to have been some kind of family joint venture at some point in time,[11] the only people who really knew who owned the Race Car, and in what proportion if there were more than one owner, when Greg filed bankruptcy were the Andrews brothers.  Accordingly, it was their burden to come forward with the evidence to prove their ownership.  Only Greg, Brian, and possibly Jeff know who contributed what to the Race Car over the many years as well as which contributions, if any, were considered a gift to one of the others.  In the 2009 Trial, Brian claimed that he owned 75% of the car while Jeff owned 25% of it.  In the 2011 Trial, Brian claimed to own "110%" of the car.  To show Brian's ownership interest, Brian attempted to show that he built the car from scratch. He claims to have purchased the 1982 Camaro chassis for $2,500, to have put his 454 Big Block engine[12] from an old yellow truck in the Race Car, and to have purchased at least $1,516.30 in parts for the Race Car.  The problem with this evidence is that its validity is entirely dependent on the word of Brian and Greg and two of their friends, Sides and Mize (and even Sides and Mize acknowledge that they do not know who owns the Race Car).  The

---

[11] From a generous point of view, the Court can only conclude that some of Brian and Greg's testimony was true some of the time, and that Brian and Greg may have jointly owned the Race Car at some point prior to their falling out.

[12] The Defendants provided no evidence as to the value of this engine.

Court cannot rely on the testimony of these parties. As pointed out in the Court's findings of fact, there were multiple inconsistencies between Greg and Brian's testimony during both the 2009 and the 2011 Trials. They contradicted themselves and each other, specifically as follows:

- In the 2009 Trial, Brian and Ronda testified that both Brian and Jeff owned the Race Car with Jeff owning a 25% interest in it as a result of him paying $5,000 for some part for the car. In the 2011 Trial, Greg, Brian, and Jeff all testified that only Brian owned the car, and that Jeff had paid only $2,500 for the 2002 fiberglass body style put on the Race Car.

- In the 2011 Trial, Brian testified he purchased all the parts for the Race Car but both Greg and Watson testified that Watson contributed to the purchase of some parts for the car. Brian claimed he had a specific conversation with Watson about the sponsorship of the car, while Watson testified that he never discussed sponsoring the car with Brian. It is unlikely any such conversation would have occurred once Watson was sponsoring Greg and the Race Car given the testimony about Brian and Greg's falling out, and Greg's subsequent possession of the Race Car.

- Greg listed the $30,000 Race Car on a loan application but claimed through sworn testimony that it was listed as a reference to a $25,000 life insurance policy on his life.[13]

---

[13] The Court has never been asked to believe anything as unlikely as Greg's explanation of why the Race Car was listed on this loan application. In order to believe his story, the Court would have to believe that when Greg applied for a bank loan to buy a motorcycle, the loan officer (who was not called to testify, but who filled out the application for the loan) put the Race Car valued at $30,000 in the life insurance slot NOT because the transportation slots on the form had room for

- In the 2009 Trial, Tony Sides testified that Jeff had him list the Race Car for sale on www.RacingJunk.com, but at the 2011 Trial, Sides testified that Brian instructed him to post the listing.

- At the 2009 Trial, Greg testified that the Race Car was at his home that day. At the 2011 Trial, Greg specifically testified that the Race Car was not at his home that day.

- Despite his knowledge that there was "some confusion" about ownership of the Race Car, and specific knowledge that the ownership of the Race Car was an issue before this Court, Brian (according to his own testimony) dismantled the Race Car, painted it blue, and sold it to Melton just 17 days after this Court found that Greg had an ownership interest in the car. Greg admitted that he told Brian and his other brothers about the Court's ruling the same day it was made; Brian admitted there was "some confusion" about who owned the Race Car. He was present as a witness at the 2009 Trial and was questioned about who owned the Race Car. According to his testimony, he asked Greg's counsel what he should do with the car, showing that he understood the car's ownership was an issue. Furthermore, Greg certainly knew that ownership of the Race Car was an issue before this Court – an issue that might cost him his discharge – and yet, even according to his version of events, he helped Brian paint the car blue (although Brian testified he painted the car blue, Greg specifically testified that he had been the one to paint it).

---

only two entries, while Greg had three such assets, but because the loan officer meant to list the $25,000 life insurance policy which Greg purchased because he owned the Race Car. This implausible explanation is evidence that Greg would say anything to disclaim his ownership of the Race Car.

• Finally, notwithstanding the effort by Greg, Brian, and their friends, Mize and Sides, to downplay the importance of Greg's name on the window, and to explain that only drivers get their names on the windows, and that having one's name on the window is not evidence of ownership, according to the testimony of these parties, and particularly Brian himself, Brian was extremely defensive about his ownership of the car. Specifically, he testified he told Watson that he owned 110% of the Race Car (not that the Court believes such a conversation took place), and Mize testified that he often teased Brian about the car belonging to Greg and that Brian got very upset about it.

• Further, Watson testified that Greg held himself out as the Race Car's owner and Watson therefore believed that Greg owned the Race Car. In the 2009 Trial, Greg also acknowledged that he frequently told people it was his car. He also listed the Race Car as one of his assets on the loan application he submitted when financing a motorcycle in 2008. Watson and Greg owned and operated a business together after Greg's falling out with Brian – it was during this time that Watson helped sponsor the Race Car and even bought an RV which Greg painted to match the Race Car. Watson testified he had no dealings with Brian concerning the Race Car. The logical conclusion this Court must reach, given that it finds Watson credible and Brian incredible, is that Greg owned the Race Car and Brian was not asserting an ownership interest in it at the time Greg filed bankruptcy.

In sum, the Court has limited evidence before it regarding ownership of the Race Car. On one hand, it has Greg's possession of the Race Car, his own assertion to others that he owned the Race Car, and a loan application where Greg listed the Race Car as an asset. On

the other hand, the Court has the testimony of the Andrews' brothers and their friends that Brian purchased the chassis and parts to build the Race Car, put his own engine in the Race Car, and considered himself its owner.   In order for the Court to find that Greg had no ownership interest in the Race Car, as the Defendants insist, the Court would have to:

(1)     treat its prior findings of fact as if those facts did not exist;

(2)     ignore Greg and Brian's 2009 testimony, but credit their testimony about the exact same subject in 2011; and

(3)     believe Greg's "story" about why a loan application which he signed to borrow money to buy a motorcycle stated that he owned a race car worth $30,000.

The Court cannot do what the Defendants ask and ignore their prior testimony or Greg's implausible explanation about the loan application.  As a result of their inconsistent and contradictory testimony, the Court cannot rely on Greg or Brian's testimony.  Therefore, the Court must conclude that the Race Car was entirely property of Greg's bankruptcy estate. There is no question that Greg and Brian took apart the Race Car, repainted it, and partially transferred it post-petition without the Trustee's knowledge or approval and without permission from this Court.  Accordingly, the Court must decide what the appropriate remedy is for the dismantling and transfer of the Race Car.

"The appropriate damages [under § 549] are measured by the value lost by the estate [on the date] the transfer was made." *In re Beshears*, 196 B.R. 464, 468 (Bankr. E.D. Ark. 1996).  The Defendants listed the Race Car for sale for $35,000 shortly before the Debtors filed bankruptcy; Greg listed the Race Car as a $30,000 asset on the loan application; and the

27

Trustee seeks a $30,000 joint and several judgment against Greg and Brian.  The Court finds those damages to be an appropriate measure of the loss to the estate on the date the transfer was made, and hereby enters a joint and several judgment against Brian and Greg for $30,000.[14]

## Damages for Violation of the Automatic Stay

The Court next considers whether the Trustee may receive an award for his costs and attorney's fees in bringing this action as damages for violation of the automatic stay.  The automatic stay applies to property of the estate until it is no longer property of the estate. 11 U.S.C. § 362(c)(1).  The party seeking damages for a stay violation must establish that: "(1) a violation occurred; (2) the violation was committed willfully, (3) the violation caused actual damages."  *Rosengren v. GMAC Mortg. Corp.*, No. CIV. 00-971(DSD/JMM), 2001 WL 1149478, at * 2 (D. Minn. Aug. 7, 2001) (citing *Lovett v. Honeywell, Inc.*, 930 F.2d 625, 628 (8th Cir. 1991) (further citations omitted)).  "A willful violation of the automatic stay occurs when the creditor acts deliberately with knowledge of the bankruptcy petition." *Knaus v. Concordia Lumber Co., Inc. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir. 1989) (citations omitted).  *See also Fleet Mortgage Group, Inc. v. Kaneb (In re Kaneb)*, 196 F.3d 265, 269 (1st Cir. 1999) ("A willful violation does not require a specific intent to violate the automatic stay.  The standard for a willful violation of the automatic stay under § 362[(k)]

---

[14] The Court finds a joint and several judgment to be appropriate in that only Greg, Brian, and Jeff know who received the funds from the sale of the Race Car, as well as who still has possession of the engine or other parts.

is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation.").

There is no question that the stay was violated when Brian and Greg dismantled and sold the Race Car while administration of the Debtors' case was ongoing. The Court further finds, as previously explained, that Brian and Greg knew of the bankruptcy and that ownership of the Race Car was an issue before this Court, and that the Court had already decided that Greg held an interest in the Race Car when he filed bankruptcy. In fact, according to Brian's own testimony, he left the courtroom after the 2009 Trial fully aware that he may not be able to do as he pleased with the car. If his testimony on this point is true, he was concerned enough to ask Greg's attorney what he was allowed to do with the car. The Court therefore finds that Brian and Greg's actions in dismantling and selling the Race Car constituted a willful violation of the automatic stay. *See generally In re Lickman*, 297 B.R. 162, 194 (Bankr. M.D. Fl. 2003) (internal citations omitted) ("'Knowledge of the bankruptcy petition has been held to be the legal equivalent of knowledge of the automatic stay.' . . . Notice of the bankruptcy petition 'does not have to come through formal means.'"). *See also In re Knaus*, 889 F.2d at 775.

While it is clear that Brian and Greg willfully violated the automatic stay, it is not clear to what extent the Trustee may recover damages for that violation. Brian and Jeff's post-trial brief asserts that the Trustee does not have standing to pursue damages for violation of the automatic stay under 11 U.S.C. § 362(k). Section 362(k) states that "an individual

injured by any willful violation of a stay provision by this section shall recover actual damages, including costs and attorney fees, and in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). Brian and Jeff argue that the Trustee is not an "individual" and, therefore, cannot pursue damages under this provision.

There is a divergence in the courts as to whether the term "individual" is expansive enough to encompass the trustee of a debtor's estate. *See* 2B Bankr. Service L. Ed. § 19:1299 (providing a list of cases). *See also In re Lickman*, 297 B.R. 162, 194 (Bankr. M.D. Fl. 2003). The Eighth Circuit has not specifically addressed this issue. However, in a case interpreting that same provision of § 362(k), the Eighth Circuit stated that the "plain meaning" of the term "individual" prohibits use of the statute by a corporate debtor. *See Just Brakes Corp., Inc.*, 108 F.3d 881, 884-85 (8th Cir. 1997). Accordingly, it is unclear whether the Eighth Circuit may afford a similar "plain meaning" interpretation and find that the meaning of "individual" as used in § 362(k) does not encompass the trustee. Nonetheless, all of the authority on this issue states that the trustee may find a remedy for intentional violations of the automatic stay through 11 U.S.C. § 105(a) which provides, in part, that the bankruptcy court

> may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title [and] . . . no provision . . . shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*See In re Ibach*, 399 B.R 61, 71 (Bankr. D. Minn. 2008) ("[T]he general equitable powers

under the Bankruptcy Code's 'all-writs' provision, 11 U.S.C. § 105(a), unquestionably give the court the power to redress intentional violations of the automatic stay that injure a bankruptcy estate."); *Just Brakes Corp*, 108 F.3d at 885 ("[Section] 362(a), buttressed by § 105(a), confers broad equitable power to remedy adverse effects of automatic stay violations.").  The only limitation on this power is that the trustee is not able to recover punitive damages under § 105.  *Just Brakes Corp*, 108 F.3d at 885 ("We conclude that Congress has conferred no power to punish for a violation of § 362(a), other than the punitive damage authority in § 362[(k)].");  *In re Lickman*, 297 B.R. at 195 ("Section 105(a), on the other hand, provides no authority for the imposition of punitive damages for violations of the automatic stay.").

Because it is unclear whether a trustee will qualify as an individual for purposes of § 362(k), which allows for the award of both compensatory and punitive damages for willful violations of the automatic stay, and punitive damages may not be awarded under § 105(a), the Court awards the Trustee his attorney's fees and costs in bringing this action to recover the value of the Race Car for the benefit of Debtors' bankruptcy estate as compensatory damages.  The Trustee is directed to submit a separate application which shall include an itemization of his fees and costs incurred in prosecuting this adversary proceeding.  This application must be filed with the Court within 14 days of the entry of this Order, and served on counsel for Defendants Brian and Greg Andrews who will then have an additional 14 days in which to file a response.

31

## CONCLUSION

Greg and Brian want the Court to find that the Race Car belongs entirely to Brian; and that Greg had no ownership interest in the car whatsoever.  It appears their strategy was to say anything necessary to reach that end.  But in executing this strategy, they created so many inconsistencies that the Court cannot determine that Brian and Greg own the car in specific percentages.  Only Greg and Brian have the necessary information to make such a determination if it needs to be made, and if that is the case, they can compensate each other based on that information and any prior agreements they had (but did not provide to this Court).  Because of their contradictions, their determination that the monetary value of the Race Car not be subject to the claims of Greg's creditors, and their lack of respect for the oaths they took, the Court did not receive sufficient information to overcome the presumption that Greg owned the Race Car, and that he and Brian should be held liable for its dismantling and transfer.

For the reasons stated herein, the Court will award the Trustee a joint and several judgment against Defendants Brian Andrews and Greg Andrews in the amount of $30,000 plus the Trustee's reasonable attorney's fees and costs.  A final judgment in accordance with this Memorandum Opinion will be entered once the Trustee's fees and costs have been determined.

Audrey R. Evans
United States Bankruptcy Judge
Dated:  12/20/2011

cc:   Jeremy Bueker, attorney for the Debtors
      Thomas Streetman, attorney for the Chapter 7 Trustee
      Thomas Fowler, attorney for Defendants Brian and Jeff Andrews
      Jimmy Eaton, attorney for Defendant Harlan Melton
      Mr. Richard Cox, Chapter 7 Trustee
      U.S. Trustee